**Richard HULL, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0304–CR–359.

Court of Appeals of Indiana.

Dec. 9, 2003.

Katherine A. Cornelius, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorney for Appellees.

## OPINION

BROOK, Chief Judge.

### Case Summary

Appellant-defendant Richard Hull appeals the sentence he received after pleading guilty to two counts of murder. We vacate and remand for resentencing.

### Issues

Hull raises two issues, which we restate as:

I. Whether his delayed sentence violates Indiana law; and

II. Whether the trial court improperly deviated from the terms of his plea agreement.

### Facts and Procedural History

On October 31, 2000, the State charged Hull with two counts of murder. Hull and the State signed a written agreement in which Hull pleaded guilty to both charges and the following sentencing parameters were set forth: "Total *executed* sentence shall not exceed 90 years. State may not present argument as to whether sentences shall run consecutively, otherwise both defense and State may present evidence and argument as to sentence." Appellant's App. at 186 (emphasis added). The factual basis supporting Hull's plea reveals:

> [O]n October 25, 2000, about three o'clock in the morning, Ed Leggon saw two large people, one larger than the other, covering the bed of a pickup truck out in front—parked out in front of the home at 906 S. Meikle Street, here in Marion County, Indiana. He couldn't distinguish at that time either the race or the sex of the individuals. Later, Sarah Pender and ... Richard Hull, both acknowledged that those individuals were them. [A]t six o'clock PM that day, Stephen Stultz, an employee of the Teamsters Local Union at 869 South Meridian, discovered the bodies of a male and a female in a dumpster at the back of the Union address and that's just a short distance from the Meikle Street address. Those individuals were later identified as Andrew Cataldi and Tricia Nordman, roommates of ... Hull, and Sarah Pender. The male had been shot in the chest and the female in the chest and in the head with a shotgun. Descriptions of the victims and photos of their tattoos were shown on TV newscasts. A neighbor to the four individuals, Sarah Pender, Richard Hull, Andrew Cataldi and Tricia Nordman, there at 906 Meikle, contacted law enforcement and told them that she knew who the individuals were that were—had been killed and also told them that Sa-

rah Pender and Richard Hull also lived at that address. A search warrant was secured by Detective Kenneth Martinez and other law enforcement officers. They searched the 906 S. Meikle address and discovered, among other things, that there was a lot of blood at the scene. DNA analysis later determined that that blood belonged to—the blood that they tested belonged to Tricia Nordman, victim in this case. It was appearing as well that there'd been an attempt to clean up the blood and conceal evidence of the murders. Jana Frederick told police that Richard Hull borrowed a plug adapter around noon on October 25, 2000, to use a carpet shampoo [machine] to clean the residence there at 906 S. Meikle. The police found a Richard Hull and a Sarah Pender in Noblesville. When Richard Hull was questioned in the early morning of October 27, 2000, he initially denied any knowledge of what happened to Andrew Cataldi and Tricia Nordman. The detectives advised him of some of the evidence against him, including that he had borrowed from—Ronnie Herron's pickup truck the evening of October 23, 2000. That bodies had been moved in that pickup truck. The DNA analysis of the pickup truck showed that in the bed of the pickup truck was blood of Andrew Cataldi, one of the victims in this case. They advised him that [they] were aware that he and Sarah Pender had gone to a South U.S. 31 Wal–Mart. Sarah Pender was driven there by Richard Hull and a twelve-gauge shotgun had been purchased there the morning of October 24, 2000, just hours before Andrew Cataldi and Tricia Nordman were shot with a shotgun. Richard Hull was observed by the clerk who had handled the sale of the shotgun obtaining ammunition, which was brought to the counter and paid for—it was paid for by Ms.

Pender. That ammunition [was] twelve gauge deer slugs. Ms. Nordman was shot twice with a twelve-gauge deer slug and both Cataldi—Andrew Cataldi and Tricia Nordman were shot with a shotgun. DNA analysis of—excuse me. Strike that temporarily. Richard Hull told law enforcement officers the morning of October 27, 2000, that his sister, Tabitha, owed Andrew Cataldi money. That he and Andrew got into an argument that night. Cataldi knew he had the Mossberg shotgun that had just been purchased. Cataldi went in Hull's room to try to grab the shotgun. They got in a struggle and Hull told detectives, "He said he was going to kill my f------ family" and that argument occurred just moments before the shooting actually took place in the house. On October 28, 2000, Sarah Pender, when giving their [sic] full statement to law enforcement, turned over to them a pair of black pants belonging to [Hull]. Those pants were tested and DNA tests established that the blood on those pants was that of Andrew Cataldi and Tricia Nordman. And all those events occurred in Marion County, Indiana.

Tr. at 9–12.

The trial court accepted the plea agreement and sentenced Hull as follows:

In determining what sentence to impose, the Court will consider the evidence presented during the guilty plea hearing, the evidence presented here today, the contents of the Presentence Report, and [Hull's] statement and the input of the victims' families, the risk [Hull] would commit another crime, the nature and circumstances of this crime, [Hull's] prior criminal record, character and condition. The Court finds a number of aggravating factors. One, [Hull] does have a prior history of criminal conduct. The Court considers just those matters

that are contained in the Presentence Report that are reduced to conviction. Also, [Hull] has been placed on probation in the past and that probation was revoked. Also, the Court finds the facts of this case to be aggravating in that it involved the killing of two individuals. Also, the degree of care and planning exercised by [Hull] and his Co–Defendant, Ms. Pender, who's been described in this proceeding. It's my understanding they went on a shopping spree of sorts for some instruments of death, including a shotgun and some deer slugs, which might be inferred to be to inflict severe damage and/or death. Also, that their steps after the—the facts after the killings were that [Hull] and Ms. Pender transported the individuals and dumped them in a dumpster across town, or nearby. The Court does find two mitigating factors. One [Hull] has shown an acceptance of responsibility and entered a plea of guilty. Secondly, [Hull] was—appears to be under the influence or duress of another and was not the—when he committed these crimes, that is, of Ms. Pender. Weighing these matters out, [Hull] is sentenced to 65 years executed at the Indiana Department of Correction. On Count Two, [Hull] is sentenced to 65 years executed at the Indiana Department of Correction. The Court again reweighs the aggravating factors versus the mitigating factors and ten years of the sentence on Count Two will run consecutively to the sentence on Count One. The remaining portion is run concurrently, so the sum total executed sentence imposed is 75 years executed. No fines imposed, but costs $132, a hundred dollar Public Defender Reimbursement Fee, a two hundred dollar Safe School Fee. All these financial amounts are reduced to a monetary judgment against [Hull] at this time. [Hull] is ordered 860 days credit against the sentence. Sir, you will now be transported to the Department of Correction where you will spend the next 75 years.

*Id.* at 41–43.

## Discussion and Decision

### I. *Delayed Sentence*

■ The trial court imposed enhanced executed sentences of sixty-five years for each of the two murder convictions, but found that an aggregate executed sentence of sixty-five years would be insufficient. Hence, the court ordered that the sentences be concurrent *except* that ten years of the sentence for Count II would be served consecutively to the sentence for Count I. That is, the trial court crafted a partially concurrent/partially consecutive sentence, which in effect delayed the commencement of Hull's sentence on Count II, thereby creating a seventy-five year aggregate sentence. Hull contends and the State concedes that ordering the ten-year delay in the commencement of Hull's sentence on Count II was improper.

■ Although we typically review a sentence for an abuse of discretion, an illegal sentence is in the nature of a "void" judgment and can be attacked directly or collaterally at any time. *Beanblossom v. State,* 637 N.E.2d 1345, 1349 (Ind.Ct.App. 1994), *trans. denied.* The legislature prescribes penalties for crimes, and the trial court's discretion does not extend beyond the statutory limits. *Ratliff v. State,* 741 N.E.2d 424, 431 (Ind.Ct.App.2000), *trans. denied.* Moreover, we are duty bound to correct an illegal sentence. *Golden v. State,* 553 N.E.2d 1219, 1223–24 (Ind.Ct. App.1990), *trans. denied.* A sentence in contravention of statutory authority constitutes "fundamental error" and cannot be ignored by a court of review. *Kleinrichert v. State,* 260 Ind. 537, 543, 297 N.E.2d 822, 826 (1973).

■ "When a sentence is imposed, the commencement of that sentence cannot be delayed absent specific statutory authorization[.]" *Erby v. State*, 511 N.E.2d 302, 304 (Ind.1987); *see also Woods v. State*, 583 N.E.2d 1211, 1212–13 (Ind.1992) (concluding that five and one-half year delay in commencement of sentence violated the principles of equity and the requirements of prompt action by the State). The trial court cited and we can find no statutory support for the ten-year delay in commencement of the sentence for Count II under these circumstances.[1] Therefore, we conclude that the law does not authorize the sentence imposed on Hull.

## II. Deviation from Plea Agreement

■ Hull also argues that consistent with the plea agreement, "the trial court could not sentence [him] to more than forty-five years on either count and still have executed time left to attribute to the other count of Murder." Appellant's Br. at 6. Stated another way, if the imposed executed sentence for each murder was greater than forty-five years, then the agreement mandated that the sentences be served concurrently to prevent the executed portion of the sentence from exceeding the agreed maximum of ninety years. Hull contends that there were only two options available under the plea agreement: consecutive forty-five year sentences or concurrent forty-five year sentences. Noting that the trial court did not initially order the ninety-year sentence, Hull requests that we order the latter. While the State agrees that the current sentence violates the plea agreement, it advocates a remand for resentencing.

■ A plea agreement is contractual in nature and binds the defendant, the State, and the trial court. *Crump v. State*, 740 N.E.2d 564, 572–73 (Ind.Ct.App.2000). The trial court is given the discretion to accept or reject a plea agreement, and, if it accepts the agreement, it is strictly bound thereby. *Pritscher v. State*, 675 N.E.2d 727, 732 (Ind.Ct.App.1996); Ind.Code § 35–35–3–3(e). The presumptive sentence for murder is fifty-five years. Ind. Code § 35–50–2–3. Up to ten years may be added or subtracted depending upon aggravating and/or mitigating circumstances. *Id.*

Given that the minimum sentence on each count of murder is forty-five years and that the plea bargain provided the "[t]otal executed sentence shall not exceed 90 years[,]" the current sentence is improper. Consistent with Hull's plea agreement, any *executed* sentences greater than forty-five years must be *concurrent*—rather than consecutive or partially consecutive as the case may be. Contrary to Hull's argument, however, there were more than two options in sentencing him. The trial court could have ordered two consecutive forty-five year sentences; a total executed sentence of anything between forty-five and sixty-five years, i.e., concurrent sentences; or a sentence of greater than ninety years with a suspension of the portion in excess of ninety years. *See Crump*, 740 N.E.2d at 573 (concluding that defendant's plea agreement of no more than five years executed not violated where court imposed eight-year sentence and ordered two years executed and five years of probation). Accordingly, we vacate Hull's sentence and

---

1. To conclude otherwise could lead to some rather complicated scenarios. For instance, if Hull's sentence on Count I was overturned for some reason, would he be free for ten years before having to report to the Department of Correction to begin serving his sentence on Count II? Would he need to be monitored during the ten year hiatus? What if he committed another crime during those ten years? Could he request that he begin serving his sentence immediately rather than having it hanging over him for a decade?

remand with instructions that a new sentence be crafted within the parameters of the plea agreement and the law.[2]

Vacated and remanded.

BAKER, J., and SHARPNACK, J., concur.

2. To the extent Hull argues that a defendant should not be punished by a longer prison term after a successful appeal than that initially imposed as it would be punitive and a denial of due process according to *Azhar v. State*, 712 N.E.2d 1018 (Ind.Ct.App.1999), we cannot address his concern. Unless and until the trial court orders a revised executed aggregate sentence greater than seventy-five years, the issue is not ripe for our review. Nonetheless, we would be surprised if the trial court fashioned an executed sentence greater than seventy-five years.